UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF TEXAS

SUSSEX INSURANCE COMPANY, a South §
Carolina Corporation, f/n/a Companion §
Property and Casualty Insurance Company §
§
V. §        CAUSE NO. _____
§        **JURY**
LEM CONSTRUCTION COMPANY, INC. §
A Texas Corporation, and NATIONAL §
CONCRETE SERVICES, LTD., A Texas §
Domestic Limited Partnership §

---

**COMPLAINT FOR DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL**

---

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff SUSSEX INSURANCE COMPANY, a South Carolina Corporation

formerly known as Companion Property and Casualty Insurance Company ("SUSSEX"), pursuant to

Federal Rules of Civil Procedure, Rule 57, and the Uniform Declaratory Judgments Act, and alleges

against Defendants LEM CONSTRUCTION COMPANY, INC. ("LEM"), and NATIONAL

CONCRETE SERVICES, LTD. ("NCS") as follows:

## JURISDICTION

1.    The Court has jurisdiction over this matter pursuant, to 28 U.S.C. Section 1332, since

there is complete diversity of citizenship among the parties and since the amount in controversy,

exclusive of interest and costs, exceeds Seventy-Five Thousand Dollars ($75,000.00).

2.    Venue is proper in this District, pursuant to 28 U.S.C. Section 1391(b)(2), in that the

underlying American Arbitration Association action that gives rise to this claim was filed in this

District.

3.    At all relevant times herein, Plaintiff SUSSEX was and is a corporation organized and

existing under the laws of the State of South Carolina, with its principal place of business in the State

of South Carolina.

4.     Defendant LEM is now, and at all times mentioned in this Complaint, has been a corporation organized and existing under the laws of the State of Texas, with its principal place of business in the State of Texas.

5.     Defendant NCS is now, and at all time mentioned in this Complaint, has been a limited partnership organized and existing under the laws of the State of Texas, with its principal place of business in the State of Texas.

## GENERAL ALLEGATIONS

6.     In exchange for NCS' payment of the policy premium, SUSSEX issued NCS Commercial General Liability Policy No. DJGL102824 ("the first policy"). The first policy was effective from April 4, 2011 to April 4, 2012. The first policy was issued pursuant to all of the terms, conditions, limitations, exclusions and endorsements contained therein. All conditions precedent to the first policy have been performed. Attached hereto as Exhibit AA@ are pertinent portions of the first policy.

7.     In exchange for NCS' payment of the policy premium, SUSSEX issued NCS Commercial General Liability Policy No. DJG1102824 ("the second policy"). The second policy was effective from April 4, 2012 to April 4, 2013. The second policy was issued pursuant to all of the terms, conditions, limitations, exclusions and endorsements contained therein. All conditions precedent to the second policy have been performed. Attached hereto as Exhibit AB@ are pertinent portions of the second policy.

8.     This action arises from an underlying construction defect American Arbitration Association action commenced by LEM against NCS. The arbitration proceeding is captioned *LEM Construction Company, Inc. v. National Concrete Services*, et. al, American Arbitration Association Case No. 01-15-0004-4343 ("the arbitration proceeding"). The arbitration proceeding, in part, concerned the work of NCS on the Sludge Dewatering Building within the Surface Water Treatment Plant for the City of Sugar Land in Sugar Land, Texas.

9.     The City of Sugar Land hired CH2M Hill Engineers, Inc. ("CH2M") as the construction manager at risk for the construction of a nine million gallon per day Surface Water Treatment Plant in Sugar Land. CH2M contracted with several first-tier subcontractors, including

LEM, to perform the work to construct the Surface Water Treatment Plant. On or about October 20, 2011, LEM subcontracted with NCS for the structural concrete work for the Sludge Dewatering Building within the Surface Water Treatment Plant.

Exhibit A attached to the LEM/NCS subcontract, in part, provides:

Scope of Work shall include the following:

Inclusions:

| Item | Description |
|------|-------------|
| 1 | Lightweight concrete and reinforcing at the membrane building. |
| 2 | 6" Second Floor- Install as detailed – 10,009 sq ft, #4 at 12" O.C. |
| 3 | 3" Second Floor – Install as detailed – 834 sq ft, #4 at 12" O.C. |
| 4 | 4" Landings – Install as detailed – 865 sq ft, #4 at 12' O.C. |
| 5 | 2" Pan Stairs – Install as detailed – 551 sq ft, 6 x 6 x 10 ga |
| 6 | 4000 psi light weight concrete as specified. |
| 7 | Water curing floor. Sealant. Setting of embeds cast in concrete. |

\*\*\*

Exhibit C, attached to the LEM/NCS subcontract, provides that the total fixed price amount was $61,425.00. Moreover, Exhibit C provides that "[s]ubcontractor shall invoice LEM monthly based upon: work actually completed during the invoice period". Furthermore, Exhibit C provides:

(5)    Pursuant to Section 6 of Exhibit D, Subcontractor's application for payment shall be in accordance with standard AIA forms, which includes a standard pay application and final pay application. The final pay application is utilized when all Work has been completed, including punch list items, and has been accepted by LEM and the Owner or Owner's representative.

Exhibit D attached to the LEM/NCS subcontract, in part, provides:

3.2.1    Subcontractors shall furnish all of the labor, materials, equipment, and services, including but not limited to, competent supervision, shop drawings, samples, tools, and temporary appurtenances as are necessary for the proper performance of Subcontractor's Work in strict accordance with and reasonably inferable from the Contract Documents.

\*\*\*

3.8.2     Subcontractor shall notify LEM when portions of Subcontractor's Work are ready for testing or inspection.

\*\*\*

3.8.3     Any of Subcontractor's Work covered prior to any required test or inspection shall be uncovered and replaced at Subcontractor's expense. If, in any other circumstances, LEM considers it necessary to observe or test any covered Subcontractor's Work, Subcontract shall uncover the Work at LEM's expense. If Subcontractor's work is found to be defective or not in conformance with the Contract Documents, Subcontractor shall be responsible for all costs and losses associated with discovering, observing testing and satisfactory replacement of defective Subcontractor's Work, including without limitation, engineer and attorney fees and costs of replacement by others.

3.8.4     LEM will notify Subcontractor in writing if any of Subcontractor's Work is found to be defective or not in conformance with the Contract Documents.  Within twenty-four (24) hours of Subcontractor's receipt of this notice, Subcontractor shall proceed to take down all portions of the Work and remove from the premises and buildings all material, whether worked or unworked, which LEM or the Owner and/or Engineer shall condemn as unsound or improper or as failing to conform in anyway [sic] to the Contract Documents and shall remedy all such condemned Work and see that it complies with the Owner's requirements, at the Subcontractor's expense.  Failure of LEM or the Owner to discover defective Subcontractor's Work shall not relieve Subcontractor of its obligations under the Subcontract nor prejudice the right of LEM to reject or require correction of defective Subcontractor's work in the future.

\*\*\*

3.16     Warranties

\*\*\*

SUBCONTRACTOR AGREES TO CORRECT ALL SUBCONTRACTOR'S WORK PERFORMED UNDER THIS SUBCONTRACT WHICH PROVES TO BE DEFECTIVE IN WORKMANSHIP OR MATERIALS WITHIN A PERIOD OF ONE (1) YEAR FROM THE DATE OF SUBSTANTIAL COMPLETION OF THE WORK OR FOR A LONGER PERIOD OF TIME AS MAY BE REQUIRED BY THE PLANS AND SPECIFICATIONS.

\*\*\*

6.5     Final Payment

6.5.1     Requirement for Final Payment – Before final payment under this Subcontract is made, the following criteria, must be met:

\*\*\*

6.5.4    All punch list items have been completed and accepted.

\*\*\*

6.5.2    Failure to comply with any of the above requirements will result in denial of the final payment until all such documents are received.

6.5.3    As a prerequisite to final payment under this Subcontract, Subcontractor will execute the Final Claim Waiver document, which is included in Exhibit H, releasing all claims and indemnifying LEM and the Owner for all claims and liability arising out of the performance of this Subcontract.

7.1    <u>Indemnity</u>

7.1.1    Subcontractor's Performance

SUBCONTRACTOR AGREES TO PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS LEM, CMAR, ENGINEER, OWNER AND THEIR RESPECTIVE OFFICERS . . . FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, LOSSES, AND CAUSES OF ACTION . . . ARISING OUT OF THE ACTS, ERRORS OR OMISSION OF THE SUBCONTRACTOR OR ANY PERSONS OPERATING UNDER THE SUBCONTRACTOR IN THE PERFORMANCE OF THIS SUBCONTRACT (INCLUDING, WITHOUT LIMITATION, ANY NEGLIGENT ACTS OR STATUTORY VIOLATIONS OF THE SUBCONTRACTOR OR ANY PERSON ACTING UNDER THE SUBCONTRACTOR). [Emphasis added.]

\*\*\*

10.    <u>ATTORNEYS' FEES</u>

THE PREVAILING PARTY IN ANY DISPUTE ARISING OUT OF OR RELATING TO THIS SUBCONTRACT OR ITS BREACH THAT IS RESOLVED BY ARBITRATION OR LITIGATION SHALL BE ENTITLED TO RECOVER FROM THE OTHER PARTY REASONABLE ATTORNEY'S FEES, COSTS AND EXPENSES INCURRED BY THE PREVAILING PARTY IN CONNECTION WITH SUCH ARIBTRATION OR LITIGATION.

The subcontract's Change Order 1, dated September 15, 2011, and in the amount of $273,900.00, in part, provides:

Addition of Sludge Dewatering Building

To furnish labor, all materials less concrete, reinforcing and accessories, equipment and supervision to complete the sludge processing building structural concrete for the project described as Sugarland SWTP.

***

Sludge processing building structural concrete with related details for sludge dewatering foundation, columns, beams, shores, decking, post shores, stairs and landing, placement, finish, curing, wreck and rub. Mass excavation, backfill and compaction by others.

10.     NCS poured the structural concrete for the Sludge Dewatering Building foundation on May 19, 2012. Prior to pouring the foundation, NCS placed wood stakes within the footprint of the concrete pour to support forms for raised sections of the slab. NCS was unable to remove some of the stakes before the concrete set. A Non-Conformance Report, dated May 19, 2012, and issued by CH2M, in part, stated;

Description of non-conformance:

The work below describes the non-conformances with the contract documents during the concrete placement at the Sludge Dewatering Bldg.:

1.     Concrete material poorly consolidated along Column line B and between columns 1 and 2.

2.     Consolidation issues due to improper use of vibratory equipment – Equipment used to consolidate and move concrete, special care not used around embeds, or other obstructions.

3.     Contractor placed additional water on top of placed concrete after an hour and half in 32' x 17' area between column Line A and B and columns 3 and 5. Spider cracking, observed in slab in this location.

4.     A number of cast in place anchor bolts embedded into the slab are not plumb.

There were also assertions that the defects in the foundation included a possible cold joint, and possible surface delamination. The Non-Conformance Report, as permitted by the subcontract, concerned an inspection that took place on May 19, 2012, the date that NCS poured the foundation.

11.     In August of 2012, the City of Sugar Land asserted that the Sludge Dewatering Building foundation failed to comply with contract documents and demanded the foundation slab be

removed and replaced, pursuant to the terms of the subcontact. Sussex is informed and believes that NCS never completed its work on the project. NCS did not remove or replace the foundation. Sussex is informed and believes that LEM removed the foundation at the request of the City of Sugar Land.

12.    On or about 2015, LEM commenced the arbitration proceeding seeking damages related to LEM having to remove and replace the Sludge Dewatering Building foundation. LEM pursued claims against CH2M and NCS. In part, the Demand for Arbitration alleged:

***

<em>The Project</em>

10.    The Project was to construct a new 9 million gallon per day Surface Water Treatment Facility. The planned project construction duration was approximately 24 months. Although CH2M's invitation to bid provided for a start date in April of 2011, LEM did not receive its notice to proceed until the end of July 2011.

11.    The City of Sugar Land (the "City") hired CH2M as the construction manager at risk. In turn, CH2M contracted with several first-tier subcontractors, including LEM, to perform the work necessary to construct the plant. LEM's scope of work consisted of structural concrete, process piping, equipment installation, structural steel, miscellaneous metals, and yard piping installation for a total contract price of over $20,000,000.

<em>Issues with the Sludge Building Foundation</em>

12.    As it was allowed to do under its contract with CH2M, LEM subcontracted a portion of the structural concrete work to National. <u>In particular, National was required to construct the concrete structure known as the Sludge Dewatering Building (the "Sludge Building").</u>

13.    <u>Prior to pouring the Sludge Building bottom foundation, National placed wooden stakes within the footprint of the concrete pour to support forms for raised sections of the slab. While the pour was successfully completed, National was unable to remove some of the stakes before the concrete had set, resulting in potential voids and portions of approximately 17 stakes being left in the slab.</u>

14.    <u>After the pour, CH2M sent a noncompliance notice related to the Sludge Building foundation for the above stakes, an alleged cold joint, and potential delamination concerns.</u> It was LEM's and National's positions that certain of the alleged deficiencies did not exist, and that the stakes could be removed and the slab repaired at minimal time and cost and with no lasting effect on

the commercial or structural integrity of the structure. After various discussions among LEM, National, CH2M and the City, it was determined that LEM and National would undertake and provide an engineering study analyzing the suitability of National's remediation proposal. The engineering study showed that the remediation proposal was a viable strategy to address the issues with the slab. CH2M nonetheless rejected the solution and ordered LEM to completely demolish and rebuild the slab. This rejection occurred after an almost three-month period during which CH2M represented to LEM that the provided studies would be the determinative factor in the decision of how to address alleged deficiencies with the slab.[1]

15.     Despite its objection, LEM followed CH2M's written directive to demolish and replace the slab, as was required by the terms of the parties' contract. Pursuant to the terms of LEM's subcontract with National, LEM provided notice to National that it should immediately undertake this work as National was required to do under the subcontract agreement. National failed to undertake this work as required and stopped all communication with LEM. Because National failed to honor its contractual commitments, LEM was forced to undertake this work on its own and through contracts with additional subcontractors.

16.     Pursuant to the terms of the parties' contract, LEM submitted a claim to CH2M for both extra time and extra cost for having to undertake the extra work of demolishing and rebuilding the slab, work that should not have been required. Despite the contractual requirement that CH2M prosecute LEM's claim through the contract's pass-through provision to the City, CH2M refused.

*     *     *

*Claims Against National*

21.     LEM's claims against National are for breach of the parties' contract based upon National's failure to fulfill its contractual obligation to demolish and replace the Sludge Building slab when its work was rejected by CH2M. Under the terms of the parties' contract, National is responsible to LEM for the costs associated with replacing National's rejected work and for any and all damages that LEM has suffered and may suffer as a result of National's performance under the contract. In the event that the panel finds that National, rather than CH2M, was the cause of delay on the Project, LEM is entitled to recover damages from National, including delay damages under the contract's liquidated damages provision. Additionally, to the extent that the amounts claimed by CH2M against LEM are based upon National's performance on the Project, LEM is entitled to recover those amounts from

---

[1]  Sussex does not cite to footnote 1 attached to the Demand for Arbitration.

COMPLAINT                                          8 2716380 C:\NRPortbl\Imanage\CBLAIR\2716380_1.doc

National under the contract's indemnity and other provisions.
[Emphasis added.]

\*\*\*

13.    Despite the fact that the Demand for Arbitration did not trigger Sussex's duty to defend under the first policy or second policy, Sussex agreed to defend NCS, pursuant to a "reservation of rights" letter, dated September 3, 2015.  The Demand for Arbitration did not allege potentially covered "property damage".  Even if it had, any such allegations would have been precluded from coverage by the policies' exclusions detailed below.  Moreover, the work of NCS at-issue, in the arbitration proceeding, did not take place until after the first policy expired.

14.    In part, the "reservation of rights" letter, dated September 3, 2015, stated:

Unless otherwise indicated, Companion continues to reserves all of its rights under the Companion policies issued to National Concrete.

Despite the fact that Companion has decided to provide National Concrete with a defense, this does not mean that there will necessarily be any indemnity coverage available under the Companion policies.  As explained in our correspondence, dated May 22, 2015, it appears that Companion has no duty to provide indemnity coverage for any claim alleged against National Concrete as to the defective construction of the City of Sugarland Surface Water Treatment Plant.  At this point, there is no coverage available under the first policy, because National Concrete's work on the project began after the first policy expired.  As to the second policy, it is questionable whether any covered "property damage" is being claimed.  The only arguable basis for asserting that there are allegations of "property damage", in the Demand for Arbitration, is the alleged cold joint in the foundation.  However, coverage for any cold joint, if it amounts to "property damage", appears to be excluded by Exclusions "J(5)" and "J(6)" if it occurred  during the time National Concrete's work was ongoing, or by Exclusion "L" if it occurred after National Concrete finished its work.  Moreover, Exclusion "M" may also preclude coverage for claims related to the foundation.

\*\*\*

C.    **The Insuring Agreement**

The policies' Insuring Agreement provides:

a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will

have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

(1)     The amount we will pay for damages is limited as described in Section III - Limits Of Insurance; and

(2)     Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

b.     This insurance applies to "bodily injury" and "property damage" only if:

(1)     The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2)     The "bodily injury" or "property damage" occurs during the policy period; and

(3)     Prior to the policy period, no insured listed under Paragraph 1. of Section II - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

c.     "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II - Who Is An Insured or any "employee" authorized

by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d.   "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1)   Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2)   Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3)   Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

e.   Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

Companion reserves its rights under the above-detailed policy provisions.

**1.   "Property Damage"**

The policies define "property damage" as:

a.   Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.   Loss of use of tangible property that is not physically injured.   All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Consistent with case law throughout the United States, Texas case law holds that the incorporation of a defective component in a building is not itself "property damage" unless it causes damage to the surrounding property. (*General Manufacturing Co. v. CNA Lloyd's of Texas* (Tex. Ct. App. 1991) 806 S.W.2d 297, 299.)

As to the claims alleged in LEM's Demand for Arbitration, there are allegations of wood stakes in the concrete and of an alleged cold joint. The claim related to wood stakes in the concrete is not a claim for "property damage". It is merely a claim for defective work. As to the claim for an alleged cold joint in the concrete, it appears that such a claim is one merely for defective work. Companion reserves its rights under the above-detailed policy provision concerning "property damage'.

\*\*\*

### 5.    **"Completed Operations"**

The policies contain the following definition:

16.    "Products-completed operations hazard":

    a.    Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

        (1)    Products that are still in your physical possession; or

        (2)    <u>Work that has not yet been completed or abandoned.</u> However, "your work" will be deemed completed at the earliest of the following times:

            (a)    When all of the work called for in your contract has been completed.

            (b)    When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

            (c)    When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

        Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

   b.    Does not include "bodily injury" or "property damage" arising out of:

      (1)    The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

      (2)    The existence of tools, uninstalled equipment or abandoned or unused materials; or

      (3)    Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products completed operations are subject to the General Aggregate Limit. [Emphasis added.]

Companion reserves its rights under this policy provision.

D.    **Exclusions**

   1.    **Exclusion "J(5)"**

Exclusion (j)(5), contained in the Companion policies, states the following:

That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations;

In *Lamar Homes v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 11 (Tex. 2007), the Texas Supreme Court noted that Exclusion j(5) "applies while operations are being performed." In addition, in *CU Lloyd's of Texas v. Main Street Homes, Inc.*, 79 S.W.3d 687, 696 (Tex. App. 2002), the Court stated that "giving the exclusion its plain meaning, the use of the present tense indicates that the exclusion applies to circumstance where the contractor or subcontractors are currently working on the project. Words such as 'working', 'are', 'performing', and 'arising' are not used to extend the policy exclusion to a home purchased after construction is complete."

In addition, "use of the present tense 'are performing operations' in exclusion j(5) makes clear that the exclusion only applies to property damage that occurred during the performance of construction operations." (*Mid-Continent Cas. Co. v. JHP Dev., Inc.*, 557 F.3d 207, 213 (5th Cir. 2009); see also *Archon Invs. v. Great Am. Lloyds Ins. Co.*, 174 S.W.3d 334, 339 (Tex. App. 2005) [Pursuant to exclusion j(5) in CGL policy, damage to real property on

which insured or its subcontractors "are performing operations at the time of the loss" is excluded from coverage.].)

Companion reserves its rights under this Exclusion.

### 2.    Exclusion "J(6)"

Exclusion j(6), contained in the Companion policies, excludes the following:

That particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it ...

Paragraph (6) of this exclusion does not apply to "property damage" including in the "products-completed operations hazard."

The purpose of Exclusion j(6) is to preclude coverage for the costs of repairing or replacing particular defects that were created before the insured's operation becomes a "completed operation."

In *Mid-Continent Cas. Co. v. JHP Dev., Inc.*, 557 F. 3d 207, 215 (5th Cir. 2009), the Court held that the plain language of the exclusion:

bars coverage only for property damage to parts of a property that were themselves the subject of defective work by the insured; the exclusion does not bar coverage for damage to parts of a property that were the subject of only nondefective work by the insured and were damaged as a result of defective work by the insured on other parts of the property.

Applying *Mid-Continent*, it follows that there is no coverage for any damage to the particular part of the slab that must be restored, repaired, or replaced because National Concrete or its subcontractor performed faulty work on it.  Companion reserves its rights under the Exclusion.

### 3.    Exclusion "L"

Exclusion "L", contained in the Companion policies, precludes coverage for:

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

<u>This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor</u>. (Emphasis added.)

This exclusion applies to "property damage" resulting from the insured's work <u>following completion of the insured's operations.</u> (See *Lennar Corp. v. Great Am. Ins. Co.*, 200 S.W. 3d 651, 670 (Tex. App. 2006) [held that

Exclusion L avoids coverage for "property damage to the insured's work arising after a construction project is finished and in the owner's possession."].)

In *Wilshire Insurance Co. v. RJT Construction, LLC*, 581 F. 3d 222, 226 (5th Cir. 2009), the Court held that Exclusion L precludes coverage for the cost of repairing the insured's own work. In the underlying litigation, the Plaintiff alleged that the insured negligently repaired the house's foundation, causing cracks in the walls and ceilings. The Court held that the "your work" exclusion applied to preclude coverage for the cost of repairing and replacing the insured's foundation but did not exclude coverage for damage to other property as a result of the defective work. (*Id.* at 226.)

 Companion reserves its rights as to the application of this Exclusion.

4.    **Exclusion "M"**

Exclusion "M", contained in the Companion policies, precludes coverage for:

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1)    A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2)    A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

This exclusion is generally limited to any "loss of use" or "failure to complete" claim for property that has not been physically injured. For example, in *Admiral Ins. Co. v. H&W Indus. Servs.*, 2011 U.S. Dist. LEXIS 9417 *14 (W.D. Tex. 2001), the Court stated that "[s]ubstituting in the relevant definitions from the Policy, the 'impaired property' exclusion may be restated as an exclusion for claims based on a loss of use of uninjured property, where the loss of use arises from a defect in a product sold by the insured or from the insured's failure to perform a contract." (See also *Mid-Continent Cas. Co. v. Camaley Energy Co., Inc.*, 364 F. Supp. 2d 600, 607-08 (N.D. Tex. 2005) [Applying an "impaired property" exclusion to a suit against an insured that was based on a defect in the insured's product, which defect also constituted a failure by the insured to properly perform a contract].)

To the extent there is any "property damage" to "impaired property" or property that has not been physically injured, arising out of a defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or a delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms, this Exclusion would preclude coverage. (*See Dial-Tile Corp. v. Zurich Am. Ins. Co.*, 2004 U.S. Dist. LEXIS 14103 *16-17 (N.D. Tex. 2004); citing to *St. Paul Surplus Lines Ins. Co. v. Geo Pipe Co.*, 25 S.W.3d 900, 906 (Tex. App. 2000) [denied coverage under "impaired property" exclusion where property could be restored to use by the removal of the insured's products.].)

Companion reserves its rights as to the application of this Exclusion.

\*\*\*

Please understand that Companion's defense or investigation of this claim shall be without waiver or prejudice to Companion's right to contend that all or any part of any settlement, judgment, loss, damage or cost of defense is not within the terms, conditions and provisions of the referenced insurance policies. Companion also reserves the right to allocate legal fees between covered and uncovered allegations, as well as the right to recover from the insureds any legal fees, court costs, litigation expenses or indemnity payments (i.e., payments made towards a settlement or satisfaction of a judgment) for which Companion has no duty or obligation to pay. Companion further reserves the right to institute litigation to obtain a declaration of its rights and duties.

\*\*\*

15.     In a supplemental "reservation of rights" letter, dated July 28, 2016, Sussex advised that it was solely providing NCS with a defense under the second policy.

16.     The first policy contains a Supplementary Payments provision which, in part, provides:

SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

1.     We will pay with respect to any claim we investigate or settle, or any "suit" against an insured we defend.

a.     All expenses we incur.

\*\*\*

e.     All costs taxed against the insured in the "suit".

f.    Prejudgment interest awarded against the insured on that part of the judgment we pay.  If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g.    All interest on the full amount of any judgment that accrues after entry of judgment and before we have had offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

17.    The second policy also contains a Supplementary Payment Provision which, in part, provides:

SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

1.    We will pay with respect to any claim we investigate or settle, or any "suit"against an insured we defend.

a.    All expenses we incur.

\*\*\*

e.    All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

f.    Prejudgment interest awarded against the insured on that part of the judgment we pay.  If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g.    All interest on the full amount of any judgment that accrues after entry of judgment and before we have had offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

18.    The first policy and the second policy define "suit" as:

. . . a civil proceeding in which damages because of "bodily injury", "property damage", or "personal and advertising injury" to which this insurance applies is alleged. "Suit" includes:

a.    An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

\*\*\*

19.    The first policy and the second policy contain a Contractual Liability Exclusion, which provides:

This insurance does not apply to:

\*\*\*

b.  Contractual Liability

"Bodily Injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to liability for damages:

(1)    That the insured would have in the absence of the contract or agreement.

(2)    Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement.   Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a)    Liability to such party for, or the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b)    Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

\*\*\*

20.    The first policy and the second policy define an "insured contract" as:

a.    A contract for a lease of premises.  However, that portion of the contract for a lease of premises that indemnifies any person or organization for damages by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b.    A sidetrack agreement;

c.    Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d.    An obligation, as required by ordinance, to indemnify a municipality, except in connection with the work of a municipality;

e.    An elevator maintenance agreement;

f.    That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

\*\*\*

21.    The evidentiary hearings for the arbitration proceeding were convened on October 18, 2016, in Houston. The arbitrator was W. Jerry Hoover, Esq. On December 15, 2016, Mr. Hoover issued his "Award of Arbitrator". In part, the Award provided:

LEM has shown by a preponderance of the evidence that NCS breached its contract and warranties and failed to perform the concrete pour at issue in a good and workmanlike manner and in accordance with the project plans and specifications. Furthermore, LEM proved that NCS' project work was defective and resulted in a defective foundation that was of questionable quality. Additionally, I find that the project owner rejected the foundation resulting in claims, losses and demands being asserted against LEM and that LEM is entitled to be indemnified by NCS for those claims, losses and demands. As a proximate result, LEM suffered actual damages as awarded below.

Accordingly, the Arbitrator hereby renders this award in favor of LEM and awards LEM all of the following relief:

1.    LEM shall recover from NCS actual damages in the sum of total of **Six Hundred Ten Thousand Three Hundred Fort-Nine and 00/100 Dollars ($610,349.00)** for the following categories of damages:

a.    Reasonable costs associated with the repair and replacement of NCS's defective work totaling **$552,325.00** as further broken down in Claimant's damage model set forth in

<u>Claimant's Exhibit C-46</u>; and

    b.    Costs back-charged to LEM by CH2M Hill in the amount of **$58,024.00**.[1]

In support of the above, the Arbitrator makes the following findings:

The $58,024.00 back-charge to LEM includes $49,685.00 for materials furnished by other subcontractors that were not supplied by, worked on, or within NCS's scope of work (the "Other's Work");

The Other's Work had to be removed because of faulty workmanship and solely because of NCS's faulty workmanship.

The Other's work was physically injured, destroyed and rendered unusable as a result of being removed.

2.    LEM shall recover from NCS an additional **$255,611.39** for LEM's reasonable and necessary segregated attorneys' fees and costs;

3.    LEM is entitled to recover pre-award interest in the amount of five percent per annum, compounded annually, from October 3, 2012 through the date of this Award on the actual damages awarded in Paragraph 1 above; and

4.    LEM is entitled to recover post-award interest on the total amount of this award at the rate of five percent per annum, compounded annually, from the date of this award until it is paid in full.

**AAA Fees/Arbitrator Compensation**

The administrative fees and expenses of the American Arbitration Association (the "AAA") totaling $15,400 and the compensation and expenses of the Arbitrator totaling $20,689.50 shall be borne by NCS. Therefore, in addition to the other sums awarded herein, NCS shall reimburse LEM an amount of $25,744.75 representing that portion of said fees, compensation and expenses in excess of the apportioned costs previously incurred by LEM.

**Conclusion**

This Award is in full and final settlement of all claims and counterclaims that have been brought or may have been brought by any of the parties against any of the other parties with respect to the subject matter making the basis of the claims or counterclaims in this arbitration and all claims, counterclaims, motions or other relief not expressly granted herein are hereby DENIED. This Award is intended to dispose

---

1 Claimant's Post-Hearing Brief reveals that this $58,024.00 figure is comprised of the following (1) CFI Mechanical - $18,831.00, (2) Mass Electric - $30,855.00, and (3) CDM Smith - $8,337.73.

of all claims, counterclaims and parties to this arbitration.

22.     A letter, dated December 27, 2016, from Derrick Carson, counsel for LEM, advised Rocky Feemster, defense counsel for NCS, that the total amount of the award, in the arbitration proceeding, is $1,030,556.52.  Attached hereto as Exhibit "C" is a true and correct copy of Mr. Carson's letter.  Mr. Carson calculated this figure as follows:  (1) damages awarded $610,349, (2) attorneys' fees and costs of $255,611.39, (3) Pre-Award Interest of $138,851.38, and (4) Arbitrator's fees and expenses of $25,744.75.  Mr. Carson also noted that interest is accruing at the rate of 5% per annum from December 15, 2016.

23.     SUSSEX contends that it has no obligation to pay any part of the award, as the award concerns defective work which does not constitute Aproperty damage@ under the SUSSEX policies, with one exception.  Sussex has unilaterally agreed to pay, under the Supplementary Payments provision of the second policy, the portion of the award for $25,744.75 for administrative fees/expenses of the American Arbitration Association and the compensation/expenses of the Arbitrator, plus any accrued interest on this portion of the award.  Moreover, to the extent the award is based upon any claims of resulting Aproperty damage@, there is no coverage by operation of the various endorsements and exclusions contained in the policies, including, but not limited to, those identified in paragraphs 14, and 16 through 20 above.

## FIRST CLAIM FOR RELIEF

### (Declaratory Relief - Duty to Defend NCS Under the First Policy Against NCS and LEM)

24.     SUSSEX incorporates by reference paragraphs 1 through 23 as though fully set forth herein.

25.     An actual controversy has arisen and now exists between SUSSEX, on the one hand, and Defendants NCS and LEM, on the other hand, concerning their respective rights and obligations under the first policy, with respect to the duty to defend as follows:

(a) SUSSEX alleges that it had no duty to defend  NCS against  the arbitration proceeding under the first policy pursuant to the terms and conditions contained in that policy including, but not necessarily limited to,

COMPLAINT                                    21 2716380 C:\NRPortbl\Imanage\CBLAIR\2716380_1.doc

the Insuring Agreement, the Supplementary Payments provision, and exclusions "J(5)", "J(6)", K, L, M and the Contractual Liability Exclusion. The Demand for Arbitration did not seek damages for any potentially covered claim. SUSSEX's position, in part, is based upon the fact that the work of NCS at-issue in the arbitration proceeding was not commenced until after the first policy expired on April 4, 2012. The claims in the arbitration proceeding were based upon the work of NCS on May 19, 2012, when NCS poured the concrete foundation at-issue. SUSSEX is informed and believes that Defendants NCS and LEM disagree with SUSSEX's position in this regard.

26.   Sussex contends that a declaratory judgment is both necessary and proper at this time. Such a declaration is necessary and appropriate in order for the parties, and each of them, to ascertain their rights and duties with respect to the defense of NCS against the arbitration proceeding.

## SECOND CLAIM FOR RELIEF
### (Declaratory Relief - Duty to Indemnify NCS Under the First Policy Against NCS and LEM)

27.   SUSSEX incorporates by reference paragraphs 1 through 23 as though fully set forth herein.

28.   An actual controversy has arisen and now exists between SUSSEX, on the one hand, and Defendants NCS and LEM, on the other hand, concerning their respective rights and obligations under the first policy, with respect to the duty to indemnify as follows:

(a) SUSSEX alleges that it has no duty to indemnify NCS against the award in the arbitration proceeding under the first policy pursuant to the terms and conditions contained in that policy including, but not necessarily limited to, the Insuring Agreement, the Supplementary Payments provision, and exclusions "J(5)", "J(6)", K, L, M and the Contractual Liability Exclusion. The damages awarded were not for any covered claim. SUSSEX's position, in part, is based upon the fact that work of NCS at-issue in the arbitration

proceeding was not was not commenced until after the first policy expired on April 4, 2012. The claims in the arbitration proceeding were based upon the work of NCS on May 19, 2012, when NCS poured the concrete foundation at-issue.   SUSSEX is informed and believes that Defendants NCS and LEM disagree with SUSSEX's position in this regard.

29.    Sussex contends that a declaratory judgment is both necessary and proper at this time.   Such a declaration is necessary and appropriate in order for the parties, and each of them, to ascertain their rights and duties with respect to the indemnity of NCS against the award in the arbitration proceeding.

### THIRD CLAIM FOR RELIEF
**(Declaratory Relief - Duty to Pay the Award in the
Arbitration Proceeding Under the First Policy Against NCS and LEM)**

30.    SUSSEX incorporates by reference paragraphs 1 through 23 as though fully set forth herein.

31.    An actual controversy has arisen and now exists between SUSSEX, on the one hand, and Defendants NCS and LEM, on the other hand, concerning their respective rights and obligations under the first policy, with respect to the duty to pay the award in the arbitration proceeding as follows:

(a) SUSSEX alleges that it has no duty to pay any portion of the award in the arbitration proceeding under the first policy pursuant to the terms and conditions contained in that policy including, but not necessarily limited to, the Insuring Agreement, the Supplementary Payments provision, and exclusions "J(5)", "J(6)", K, L, M and the Contractual Liability Exclusion. In part, Sussex's position is based upon the fact that the Demand for Arbitration did not seeking any potentially covered damages.  Moreover, the award was not for any covered claim.  SUSSEX's position, in part, is also based upon the fact that work of NCS at-issue in the arbitration proceeding was not was

not commenced until after the first policy expired on April 4, 2012. The claims in the arbitration proceeding were based upon the work of NCS on May 19, 2012, when NCS poured the concrete foundation at-issue. SUSSEX is informed and believes that Defendants NCS and LEM disagree with SUSSEX's position in this regard.

32.     Sussex contends that a declaratory judgment is both necessary and proper at this time.  Such a declaration is necessary and appropriate in order for the parties, and each of them, to ascertain their rights and duties with respect to whether Sussex has an obligation to pay for any portion of the award in the arbitration proceeding.

**FOURTH CLAIM FOR RELIEF**
**(Declaratory Relief - Duty to Defend NCS Under**
**the Second Policy Against NCS and LEM)**

33.     SUSSEX incorporates by reference paragraphs 1 through 23 as though fully set forth herein.

34.     An actual controversy has arisen and now exists between SUSSEX, on the one hand, and Defendants NCS and LEM, on the other hand, concerning their respective rights and obligations under the second policy, with respect to the duty to defend the arbitration proceeding as follows:

(a) SUSSEX alleges that it had no duty to defend the arbitration proceeding under the second policy,  pursuant to the terms and conditions contained in that policy, including, but not necessarily limited to, the Insuring Agreement, the Supplementary Payments provision, and exclusions "J(5)", "J(6)", K, L, M and the Contractual Liability Exclusion.  The Demand for Arbitration did not seek any damages for a potentially covered claims.   Sussex is informed and believes that Defendants LEM and NCS disagree with Sussex's position in this regard.

35.     Sussex contends that a declaratory judgment is both necessary and proper at this time.  Such a declaration is necessary and appropriate in order for the

1   parties, and each of them, to ascertain their rights and duties with respect to

2   the defense of NCS against the arbitration proceeding.

### FIFTH CLAIM FOR RELIEF
**(Declaratory Relief - Duty to Indemnify NCS Under
the Second Policy Against NCS and LEM)**

5   36.   SUSSEX incorporates by reference paragraphs 1 through 23 as though fully set forth

6   herein.

7   37.   An actual controversy has arisen and now exists between SUSSEX, on the one hand,

8   and Defendants NCS and LEM, on the other hand, concerning their respective rights and obligations

9   under the second policy, with respect to the duty to indemnify NCS against the award in the

10  arbitration proceeding as follows:

11  (a) SUSSEX alleges that it has no duty to indemnify NCS against the award

12  in the arbitration proceeding under the second policy, except for the portion

13  of the Award for $25,744.75 for administrative fees/expenses of the

14  American Arbitration Association and the compensation/expenses of the

15  Arbitrator pursuant to the terms and conditions contained in that policy,

16  including, but not necessarily limited to, the Insuring Agreement, the

17  Supplementary Payments provision, and exclusions "J(5)", "J(6)", K, L, M

18  and the Contractual Liability Exclusion. The damages awarded were not for

19  any covered claim. No damages were awarded for "property damage". To

20  the extent, if any, that damages were awarded for "property damage", then the

21  policy's exclusions would preclude coverage including, but not necessarily

22  limited to, the following exclusions, "J(5)", "J(6)", K, L, and M. Sussex is

23  informed and believes that Defendants LEM and NCS disagree with Sussex's

24  position in this regard.

25  38.   Sussex contends that a declaratory judgment is both necessary and proper at

26  this time. Such a declaration is necessary and appropriate in order for the

parties, and each of them, to ascertain their rights and duties with respect to the indemnity of NCS against the award in the arbitration proceeding.

## SIXTH CLAIM FOR RELIEF
### (Declaratory Relief - Duty to Pay the Award in the Arbitration Proceeding Under the Second Policy Against NCS and LEM)

39.     SUSSEX incorporates by reference paragraphs 1 through 23 as though fully set forth herein.

40.     An actual controversy has arisen and now exists between SUSSEX, on the one hand, and Defendants NCS and LEM, on the other hand, concerning their respective rights and obligations under the second policy, with respect to the duty to pay the Award in the arbitration proceeding as follows:

(a)  SUSSEX alleges that it has no duty to pay the Award in the arbitration proceeding under the second policy, except for the portion of the Award for $25,744.75 for administrative fees/expenses of the American Arbitration Association and the compensation/expenses of the Arbitrator pursuant to the terms and conditions contained in that policy, including, but not necessarily limited to, the Insuring Agreement, the Supplementary Payments provision, and exclusions "J(5)", "J(6)", K, L, M and the Contractual Liability Exclusion. The Demand for Arbitration did not seeking any potentially covered damages and the damages awarded were not for any covered claim. No damages were awarded for "property damage". To the extent, if any, that damages were awarded for "property damage", then the policy's exclusions would preclude coverage including, but not necessarily limited to, the following exclusions, "J(5)", "J(6)", K, L, and M. Sussex is informed and believes that Defendants LEM and NCS disagree with Sussex's position in this regard.

41.     Sussex contends that a declaratory judgment is both necessary and proper at this time. Such a declaration is necessary and appropriate in order for the

parties, and each of them, to ascertain their rights and duties with respect to whether Sussex has an obligation to pay for any portion of the award in the arbitration proceeding.

### **PRAYER FOR RELIEF**

WHEREFORE, SUSSEX prays for judgment against Defendants as follows:

1.    For a judicial declaration that:

    (a)    Sussex, under the first policy, had no duty to defend NCS against the arbitration proceeding;

    (b)    Sussex, under the first policy, has no duty to indemnify NCS against the award in the arbitration proceeding;

    (c)    Sussex, under the first policy, has no duty to pay for any portion of the award in the arbitration proceeding;

    (d)    Sussex, under the second policy, had no duty to defend NCS against the arbitration proceeding;

    (e)    Sussex, under the second policy, has no duty to indemnify NCS against the award in the arbitration proceeding, except for the portion of the Award for $25,744.75 for administrative fees/expenses of the American Arbitration Association and the compensation/expenses of the Arbitrator;

    (f)    Sussex, under the second policy, has no duty to pay for any portion of the award in the arbitration proceeding, except for the portion of the Award for $25,744.75 for administrative fees/expenses of the American Arbitration Association and the compensation/expenses of the Arbitrator;

2.    For damages according to proof;

3.    For an award of SUSSEX's costs in this action; and

4.    For other and further relief as the Court deems just and proper.

Respectfully submitted,

**SHEEHY, WARE & PAPPAS, P.C.**

By: _____
James L. Ware
SBN 20861800
Two Houston Center
909 Fannin Street, Suite 2500
Houston, Texas 77010
713-951-1000 – Telephone
713-951-1151 – Direct
713-951-1199 – Facsimile
jware@sheehyware.com

**Attorneys for Plaintiff**
**Sussex Insurance Company**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been sent to all counsel of record, via e-file, on January _17_, 2017.

_____
James L. Ware

## DEMAND FOR JURY TRIAL

Plaintiff Sussex Insurance Company hereby demands trial by jury in this action, pursuant to Rule 38(a) of the Federal Rules of Civil Procedure.

By: _____
James L. Ware
SBN 20861800
Two Houston Center
909 Fannin Street, Suite 2500
Houston, Texas 77010
713-951-1000 – Telephone
713-951-1151 – Direct
713-951-1199 – Facsimile
jware@sheehyware.com

**Attorneys for Plaintiff**
**Sussex Insurance Company**