UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF TEXAS

SUSSEX INSURANCE COMPANY, a South §
Carolina Corporation, f/n/a Companion §
Property and Casualty Insurance Company §
                                       §
V.                                     §      CAUSE NO. 4:17-cv-00147
                                       §
LEM CONSTRUCTION COMPANY, INC. §
A Texas Corporation, and NATIONAL §
CONCRETE SERVICES, LTD., A Texas §
Domestic Limited Partnership §

---

## PLAINTIFF SUSSEX INSURANCE COMPANY'S NOTICE OF MOTION AND MOTION FOR A DEFAULT JUDGMENT

# TABLE OF CONTENTS

I.  STANDARD OF REVIEW/SUMMARY OF ARGUMENT…..................................1

II.  FACTUAL BACKGROUND…...............................................................…..........2

    A.  The Sussex Policies Issued to NCS…………….....................................…..2

    B.  The Underlying Construction Defect Claim……………………………..…..2

    C.  The Arbitration…………….....………………………………….……...…..5

    D.  The Instant Action…………….....………………………….……......…..9

III.  SUSSEX IS ENTITLED TO ENTRY OF A DEFAULT JUDGMENT…………….10

    A.  Introduction …………………………………………...….........……10

    B.  Sussex is Entitled to Entry of a Default Judgment………………………....…..12

        1.  Sussex Has no Duty to Indemnify NCS or Pay
            The Award Under the First Policy………........……………………....12

        2.  Sussex Had no Duty to Defend NCS
            Under the Policies……………………….....…..........................13

            a.  Insuring Agreement……………………….....................14

            b.  Exclusion j(5)……………………………….........................16

            c.  Exclusion j(6)……………………………………....…..17

            d.  Exclusion L……………………………………….....…..17

            e.  Exclusion M………………………………………….…..18

        3.  Sussex Need Not Indemnify Nor Pay the
            Award Under the Second Policy, Other Than to the
            Extent it has Already Paid for the Award……………………….19

            a.  Attorney's Fees/Costs Under the Award…………………….......20

            b.  Damages included In the Award………………………….......20

IV.  CONCLUSION……………………………………………………….....…..24

1

## TABLE OF AUTHORITIES

2

### Cases

3  *ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832 (5th Cir. 2012).......... 14

4  *Admiral Ins. Co. v. H&W Indus. Servs.*, 2011 U.S. Dist. LEXIS 9417 (W.D. Tex. 2001).......... 19

5  *Berkeley Assur. Co. v. Serrano*, 2014 U.S. Dist. LEXIS 170281 (W.D. TX 2014)..................... 10

6  *Boland v. Yoccable Const. Co., Inc.*, 293 FRD 13 (D DC 2013)..................................................... 1

7  *General Manufacturing Co. v. CNA Lloyd's of Texas*, 806 S.W.2d 297

8  (Tex. Ct. App. 1991) ............................................................................................................. 15

9  *Harken Explo. Co. v. Sphere Drake Ins. P.L.C.*, 261 F.3d 466 (5th Cir. 2001)........................... 14

10  *Intercontinental Group  Partnership v. KB Home Lone Star L.P.*, 295 S.W.3d 650

11  (Tex App. 2009) .................................................................................................................... 13

12  *Mid-Continent Cas. Co. v. JHP Dev., Inc.*, 557 F.3d 207 (5th Cir. 2009)................................... 16

13  *New Hampshire Ins. Co. v. Viera*, 930 F.2d 696 (9th Cir. 1991).................................................. 22

14  *Potomac Ins. Co. v. Jayhawk Med. Acceptance Corp.*, 198 F.3d 548 (5th Cir. 2000) ................ 14

15  *RSDC Holdings, LLC v. Steinberg*, 2017 U.S. Dist. LEXIS 4465 (E.D. LA. 2017).............. 11, 12

16  *TeleVideo Systems, Inc. v. Heidenthal*, 826 F.2d 915 (9th Cir. 1987) ........................................... i

17  *U.S. Metal, Inc. v. Liberty Mutual Group, Inc.*, 490 S.W. 3d 20 (2015) ......................... 22, 23, 24

18  *Wilshire Insurance Co. v. RJT Construction, LLC*, 581 F. 3d 222 (5th Cir. 2009) ..................... 18

19  *Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490 (5th Cir. 2015). ..................................... 1

20

### Statutes

21  Federal Rules of Civil Procedure Rule 55(b)(2) ........................................................................... 1

22

### Other Authorities

23  Cold Joints, The Concrete Society, (July 20, 2017)

24  http://www.concrete.org.uk./fingertips-nuggets.asp?cmd=display&id=372 ............................... 15

25

26

27

28

1

**NOTICE OF MOTION**

2 To the Honorable Judge of Said Court:

3        PLEASE TAKE NOTICE THAT Plaintiff Sussex Insurance Company, formerly known as

4 Companion Property and Casualty Insurance Company ("Sussex"), will move for entry of a Default

5 Judgment against Defendant National Concrete Services, LTD. ("NCS"), pursuant to Rule 55(b)(2)

6 of the Federal Rules of Civil Procedure ("Rule 55(b)(2)"). This Motion will be brought before Judge

7 Sim Lake of the above-referenced Court located at 515 Rusk St., Houston, TX 77022. The Motion

8 will be based upon this Notice of Motion, the following Memorandum of Points and Authorities, the

9 concurrently filed Affidavits of James Silverstein and Rocky Feemster, the concurrently filed

10 Appendix of Exhibits, and all pleadings filed in the instant action.

11

**MEMORANDUM OF POINTS AND AUTHORITIES**

12        Sussex moves for entry of a Default Judgment against NCS, pursuant to Rule 55(b)(2).

13 Sussex is seeking to have the Court consider whether Sussex had a duty to defend and indemnify an

14 arbitration award against Sussex's insured NCS.

15 **I.    STANDARD OF REVIEW/SUMMARY OF ARGUMENT**

16        Upon Entry of Default, the factual allegations of the Complaint, except those relating to the

17 amount of damages, will be taken as true. (*TeleVideo Systems, Inc. v. Heidenthal*, 826 F.2d 915, 917

18 (9th Cir. 1987).)  On the other hand, a defaulting defendant does not concede the complaint's ill-

19 pleaded factual allegations or conclusions of law. (*Wooten v. McDonald Transit Assocs., Inc.*, 788

20 F.3d 490, 496 (5th Cir. 2015).)  Granting or denying the entry of a Default Judgment is committed to

21 the Court's sound discretion. (*Boland v. Yoccable Const. Co., Inc.*, 293 FRD 13, 17 (D DC 2013).)

22        As explained below, this case concerns NCS, a subcontractor, who installed a foundation for

23 a water treatment plant in Sugar Land, Texas.  Ultimately, the general contractor, LEM Construction

24 Company, Inc. ("LEM"), removed and replaced the foundation, which was claimed to be defective.

25 LEM obtained an arbitration award against NCS.  Sussex insures NCS under two CGL policies.

26        This dispute concerns whether (1) Sussex had a duty to defend NCS under either policy, and

27 (2) whether any part of the award is covered under the Sussex policies.  Sussex's position, among

28 other things, is that the Demand for Arbitration did not allege that NCS caused any "property

1

1  damage", such that Sussex had no obligation to defend NCS, though it did.  Moreover, Sussex's

2  contends that it paid the only portion of the award that was potentially covered - $25,935.37 for

3  administrative fees/expenses and the compensation/expenses of the arbitrator, plus accrued interest.

4  Sussex has since paid an additional $165,170.11 toward satisfaction of the award, as a result of

5  negotiations with the underlying Plaintiff, LEM.  Sussex contends that it had no obligation to pay

6  those additional funds.  Sussex alleged that any resulting property damage, such as cracking of the

7  foundation, would be excluded from coverage by the work product exclusions, including Exclusions

8  j(5), j(6), and l, as the deficiency of NCS' work was discovered before NCS completed the contract.

9  **II.    FACTUAL BACKGROUND**

10        Sussex filed this action to litigate whether and to what extent CGL insurance policies issued

11  by Sussex to NCS provide coverage for an American Arbitration Association ("AAA") award against

12  NCS and in favor of LEM.  (See paragraphs ("¶'s") 8, 21-23 and 25-41 of Plaintiff's Complaint

13  ("Comp."), which is attached to the concurrently filed Appendix of Exhibits ("AOE") at Exhibit

14  ("Ex.") 1).  This action was filed on January 17, 2017.  The clerk entered the default of NCS on June

15  2, 2017, and LEM settled with Sussex and has been dismissed.

16        **A.    The Sussex Policies Issued to NCS**

17        Sussex issued NCS Policy No. DJGL102824, which was effective from April 4, 2011 to April

18  4, 2012 ("the first policy").  (Comp., ¶ 6, (AOE, Ex. 1).)  The pertinent portions of the first policy are

19  attached as Ex. "A" to the Complaint.  Sussex also issued NCS Policy No. DJG1102824, which was

20  effective from April 4, 2012 to April 4, 2013 ("the second policy).  (Comp., ¶ 7 (AOE, Ex.1).)  The

21  relevant parts of the second policy are attached as Exhibit "B" to the Complaint.

22        **B.    The Underlying Construction Defect Claim**

23        This action arises from a construction defect AAA action commenced by LEM against NCS,

24  which was captioned *LEM Construction Company, Inc. v. National Concrete Services*, et. al,

25  American Arbitration Association Case No. 01-15-0004-4343 ("the arbitration").  The arbitration, in

26  part, concerned the work of NCS on the Sludge Dewatering Building within the Surface Water

27  Treatment Plant for the City of Sugar Land.  (Comp., ¶ 8 (AOE, Ex.1).)

28

PLAINTIFF SUSSEX'S MOTION FOR A DEFAULT JUDGMENT        G:\4937\Pleadings\motionfordefaultjudgment_2.doc

The City of Sugar Land hired CH2M Hill Engineers, Inc. ("CH2M") as the construction manager for the construction of a nine-million gallon per day Surface Water Treatment Plant.  On or about October 20, 2011, LEM subcontracted with NCS for the structural concrete work for the Sludge Dewatering Building within the Surface Water Treatment Plant. (Comp., ¶ 9 (AOE, Ex.1).)

Exhibit A attached to the LEM/NCS subcontract, in part, provides:

Scope of Work shall include the following:

Inclusions:

| Item | Description |
|------|-------------|
| 1 | Lightweight concrete and reinforcing at the membrane building. |
| 2 | 6" Second Floor- Install as detailed – 10,009 sq ft, #4 at 12" O.C. |
| 3 | 3" Second Floor – Install as detailed – 834 sq ft, #4 at 12" O.C. |
| 4 | 4" Landings – Install as detailed – 865 sq ft, #4 at 12' O.C. |
| 5 | 2" Pan Stairs – Install as detailed – 551 sq ft, 6 x 6 x 10 ga |
| 6 | 4000 psi light weight concrete as specified. |
| 7 | Water curing floor. Sealant. Setting of embeds cast in concrete. |

*** (Comp., ¶ 9 (AOE, Ex.1).)

Exhibit C attached to the subcontract provides that "[s]ubcontractor shall invoice LEM monthly based upon:   work actually completed during the invoice period". Furthermore, Exhibit C provides:

(5) Pursuant to Section 6 of Exhibit D, Subcontractor's application for payment shall be in accordance with standard AIA forms, which includes a standard pay application and final pay application.  The final pay application is utilized when all Work has been completed, including punch list items, and has been accepted by LEM and the Owner or Owner's representative. (Comp., ¶ 9 (AOE, Ex.1).)

Exhibit D attached to the LEM/NCS subcontract, in part, provides:

3.8.2 Subcontractor shall notify LEM when portions of Subcontractor's Work are ready for testing or inspection.

***

3.8.   Any of Subcontractor's Work covered prior to any required test or inspection shall be uncovered and replaced at Subcontractor's expense.  If, in any other circumstances, LEM considers it necessary to observe or test any covered Subcontractor's Work, Subcontract shall uncover the Work at LEM's expense.  If Subcontractor's work is found to be defective or not in conformance with the Contract Documents, Subcontractor shall be responsible for all costs and losses associated with discovering, observing testing and satisfactory replacement of

3

defective Subcontractor's Work, including without limitation, engineer and attorney fees and costs of replacement by others.

3.8.4    LEM will notify Subcontractor in writing if any of Subcontractor's Work is found to be defective or not in conformance with the Contract Documents.  Within twenty-four (24) hours of Subcontractor's receipt of this notice, Subcontractor shall proceed to take down all portions of the Work and remove from the premises and buildings all material, whether worked or unworked, which LEM or the Owner and/or Engineer shall condemn as unsound or improper or as failing to conform in anyway [sic] to the Contract Documents and shall remedy all such condemned Work and see that it complies with the Owner's requirements, at the Subcontractor's expense.  Failure of LEM or the Owner to discover defective Subcontractor's Work shall not relieve Subcontractor of its obligations under the Subcontract nor prejudice the right of LEM to reject or require correction of defective Subcontractor's work in the future.

***

6.5    Final Payment

6.5.1    Requirement for Final Payment – Before final payment under this Subcontract is made, the following criteria, must be met:

***

6.5.4    All punch list items have been completed and accepted.

***

The subcontract's Change Order 1, dated September 15, 2011, and in the amount of $273,900.00, in part, provides:

Addition of Sludge Dewatering Building

To furnish labor, all materials less concrete, reinforcing and accessories, equipment and supervision to complete the sludge processing building structural concrete for the project described as Sugarland SWTP.
***
Sludge processing building structural concrete with related details for sludge dewatering foundation, columns, beams, shores, decking, post shores, stairs and landing, placement, finish, curing, wreck and rub.  Mass excavation, backfill and compaction by others.  (Comp., ¶ 9 (AOE, Ex.1).)

NCS poured the structural concrete for the Sludge Dewatering Building foundation on May 19, 2012.   (Comp., ¶ 10 (AOE, Ex.1).) NCS did not utilize any subcontractors on the job.  (See the concurrently filed Affidavit of Rocky Feemster ("Aff. Feemster"), ¶ 11.)

4

1    Before pouring the foundation, NCS placed wood stakes within the footprint of the concrete

2    pour to support forms for raised sections of the slab. NCS was unable to remove some of the stakes

3    before the concrete set. (Comp., ¶ 10 (AOE, Ex.1).) A Non-Conformance Report, dated May 19,

4    2012, and issued by CH2M, in part, stated;

5    Description of non-conformance:

6    The work below describes the non-conformances with the contract documents during

7    the concrete placement at the Sludge Dewatering Bldg.:

8    1    Concrete material poorly consolidated along Column line B and between
          columns 1 and 2.

9

10   2.   Consolidation issues due to improper use of vibratory equipment –Equipment
          used to consolidate and move concrete, special care not used around embeds,

11        or other obstructions.

12   3.   Contractor placed additional water on top of placed concrete after an hour and
          half in 32' x 17' area between column Line A and B and columns 3 and 5.

13        Spider cracking, observed in slab in this location.

14   4.   A number of cast in place anchor bolts embedded into the slab are not plumb.

15

16   The Non-Conformance Report, as permitted by the subcontract, concerned an

17   inspection that took place on May 19, 2012, the date that NCS poured the foundation.

18   (Comp., ¶ 10 (AOE, Ex.1).)

19   In August of 2012, the City of Sugar Land asserted that the Sludge Dewatering

20   Building foundation failed to comply with contract documents and demanded the foundation

21   slab be removed and replaced, pursuant to the terms of the subcontract. Sussex is informed

22   and believes that NCS never completed its work on the project. NCS did not remove or

23   replace the foundation. Sussex is informed and believes that LEM removed the foundation at

24   the request of the City of Sugar Land. (Comp., ¶ 11 (AOE, Ex. 1).)

25   **C.    The Arbitration**

26   In 2015, LEM commenced the arbitration seeking damages related to LEM

27   having to remove and replace the Sludge Dewatering Building foundation. LEM pursued

28   claims against CH2M and NCS. In part, the Demand for Arbitration alleged:

5

\*\*\*

*The Project*

10. The Project was to construct a new 9 million gallon per day Surface Water Treatment Facility. The planned project construction duration was approximately 24 months. Although CH2M's invitation to bid provided for a start date in April of 2011, LEM did not receive its notice to proceed until the end of July 2011.

11. The City of Sugar Land (the "City") hired CH2M as the construction manager at risk. In turn, CH2M contracted with several first-tier subcontractors, including LEM, to perform the work necessary to construct the plant. LEM's scope of work consisted of structural concrete, process piping, equipment installation, structural steel, miscellaneous metals, and yard piping installation for a total contract price of over $20,000,000.

*Issues with the Sludge Building Foundation*

12. As it was allowed to do under its contract with CH2M, LEM subcontracted a portion of the structural concrete work to National. In particular, National was required to construct the concrete structure known as the Sludge Dewatering Building (the "Sludge Building").

13. Prior to pouring the Sludge Building bottom foundation, National placed wooden stakes within the footprint of the concrete pour to support forms for raised sections of the slab. While the pour was successfully completed, National was unable to remove some of the stakes before the concrete had set, resulting in potential voids and portions of approximately 17 stakes being left in the slab.

14. After the pour, CH2M sent a noncompliance notice related to the Sludge Building foundation for the above stakes, an alleged cold joint, and potential delamination concerns. It was LEM's and National's positions that certain of the alleged deficiencies did not exist, and that the stakes could be removed and the slab repaired at minimal time and cost and with no lasting effect on the commercial or structural integrity of the structure. After various discussions among LEM, National, CH2M and the City, it was determined that LEM and National would undertake and provide an engineering study analyzing the suitability of National's remediation proposal. The engineering study showed that the remediation proposal was a viable strategy to address the issues with the slab. CH2M nonetheless rejected the solution and ordered LEM to completely demolish and rebuild the slab. This rejection occurred after an almost three-month period during which CH2M represented to LEM that the provided studies would be the determinative factor in the decision of how to address alleged deficiencies with the slab.

15. Despite its objection, LEM followed CH2M's written directive to demolish and replace the slab, as was required by the terms of the parties' contract. Pursuant to the terms of LEM's subcontract with National, LEM provided notice to National that it should immediately undertake this work as National was required to do under the subcontract agreement. National failed to undertake this work as required and stopped all communication with LEM. Because National failed to honor its contractual commitments, LEM was forced to undertake this work on its own and through contracts with additional subcontractors.

\*   \*   \*

*Claims Against National*

21. LEM's claims against National are for breach of the parties' contract based upon National's failure to fulfill its contractual obligation to demolish and replace the Sludge Building slab when its work was rejected by CH2M. Under the terms of the parties' contract, National is responsible to LEM for the costs associated with replacing National's rejected work and for any and all damages that LEM has suffered and may suffer as a result of National's performance under the contract. In the event that the panel finds that National, rather than CH2M, was the cause of delay on the Project, LEM is entitled to recover damages from National, including delay damages under the contract's liquidated damages provision. Additionally, to the extent that the amounts claimed by CH2M against LEM are based upon National's performance on the Project, LEM is entitled to recover those amounts from National under the contract's indemnity and other provisions. (Comp., ¶ 12 (AOE, Ex.1).)

\*\*\*

Despite the fact that the Demand for Arbitration did not trigger Sussex's duty to defend under the first policy or second policy, Sussex agreed to defend NCS, pursuant to a "reservation of rights" letter, dated September 3, 2015. The work of NCS at-issue, in the arbitration proceeding, did not take place until after the first policy expired. (Comp., ¶ 13 (AOE, Ex.1).) Sussex defended NCS under the second policy. (See the concurrently filed Affidavit of James Silverstein ("Aff. Silverstein") at ¶ 11.)

The "Award of Arbitrator" was issued on December 15, 2016, and, in part, provided:

LEM has shown by a preponderance of the evidence that NCS breached its contract and warranties and failed to perform the concrete pour at issue in a good and workmanlike manner and in accordance with the project plans and specifications. Furthermore, LEM proved that NCS' project work was defective and resulted in a

7

defective foundation that was of questionable quality. Additionally, I find that the project owner rejected the foundation resulting in claims, losses and demands being asserted against LEM and that LEM is entitled to be indemnified by NCS for those claims, losses and demands. As a proximate result, LEM suffered actual damages as awarded below.

Accordingly, the Arbitrator hereby renders this award in favor of LEM and awards LEM all of the following relief:

1. LEM shall recover from NCS actual damages in the sum of total of **Six Hundred Ten Thousand Three Hundred Fort-Nine and 00/100 Dollars ($610,349.00)** for the following categories of damages:

    a. Reasonable costs associated with the repair and replacement of NCS's defective work totaling **$552,325.00** as further broken down in Claimant's damage model set forth in Claimant's Exhibit C-46; and

    b. Costs back-charged to LEM by CH2M Hill in the amount of **$58,024.00**.

In support of the above, the Arbitrator makes the following findings:

The $58,024.00 back-charge to LEM includes $49,685.00 for materials furnished by other subcontractors that were not supplied by, worked on, or within NCS's scope of work (the "Other's Work");

The Other's Work had to be removed because of faulty workmanship and solely because of NCS's faulty workmanship.

The Other's work was physically injured, destroyed and rendered unusable as a result of being removed.

2. LEM shall recover from NCS an additional **$255,611.39** for LEM's reasonable and necessary segregated attorneys' fees and costs;

3. LEM is entitled to recover pre-award interest in the amount of five percent per annum, compounded annually, from October 3, 2012 through the date of this Award on the actual damages awarded in Paragraph 1 above; and

4. LEM is entitled to recover post-award interest on the total amount of this award at the rate of five percent per annum, compounded annually, from the date of this award until it is paid in full.

**AAA Fees/Arbitrator Compensation**

The administrative fees and expenses of the American Arbitration Association (the

8

"AAA") totaling $15,400 and the compensation and expenses of the Arbitrator totaling $20,689.50 shall be borne by NCS. Therefore, in addition to the other sums awarded herein, NCS shall reimburse LEM an amount of $25,744.75 representing that portion of said fees, compensation and expenses in excess of the apportioned costs previously incurred by LEM.

**Conclusion**

This Award is in full and final settlement of all claims and counterclaims that have been brought or may have been brought by any of the parties against any of the other parties with respect to the subject matter making the basis of the claims or counterclaims in this arbitration and all claims, counterclaims, motions or other relief not expressly granted herein are hereby DENIED. This Award is intended to dispose of all claims, counterclaims and parties to this arbitration. (Comp., ¶ 21 (AOE, Ex. 1).)

**D.    The Instant Action**

Sussex filed the instant action to have the Court adjudicate whether and to what extent CGL insurance policies issued by Sussex to NCS provide insurance coverage for the arbitration and the award against NCS and in favor of LEM. The Complaint contains six claims for relief: (1) Declaratory Relief – Duty to Defend NCS under the first policy, (2) Declaratory Relief – Duty to Indemnify NCS under the first policy, (3) Declaratory Relief – Duty to pay the Arbitration award under the first policy, (4) Declaratory Relief – Duty to NCS under the second policy, (5) Declaratory Relief – Duty to Indemnify NCS under the second policy, and (6) duty to pay the award in the Arbitration Proceeding under the second policy. In the Complaint, Sussex alleged, in paragraph 23, that it ". . . unilaterally agreed to pay, under the Supplementary Payments provision of the second policy, the portion of the award for $25,744.75 for administrative fees/expenses of the American Arbitration Association and the compensation/expenses of the Arbitrator, plus any accrued interest on this portion of the award". The settlement agreement entered into between Sussex and LEM reveals that Sussex paid LEM $25,744.75, plus accrued interest of $190.62. (Aff. Silverstein at ¶ 2, and Ex. 2 attached to the AOE at ¶ J of the Recitals.) NCS's default was entered on June 2, 2017.

On May 1, 2017, Sussex voluntarily dismissed LEM from the instant action. The dismissal

PLAINTIFF SUSSEX'S MOTION FOR A DEFAULT JUDGMENT          G:\4937\Pleadings\motionfordefaultjudgment_2.doc

was the result of a settlement agreement reached between Sussex and LEM.   In addition to the

$25,935.37 that Sussex paid to LEM discussed above, Sussex paid LEM an additional $165,170.11

toward satisfaction of the award.  (Ex. 2 attached to the AOE at page 9.) In part, the settlement

agreement provides:

> Though the parties dispute whether Sussex has a duty to indemnify the award against National Concrete in the Arbitration Proceeding, the Parties agree that Sussex's payment of $165,170.11 is for the following elements of the award in the Arbitration Proceeding: (1) $49,685.00 for the cost to replace plumbing and electrical lines impacted when the slab was torn out, (2) $42,932 for rebar utilized in the construction of the replacement slab, (3) $12,736.49 to tie in the new rebar, (4) accrued interest on items (1) through (3) detailed above (prejudgment interest in the amount of $22,121.78, plus post-judgment interest totaling $1,414.34 as of March 23, 2017), (5) $2,155.50 for refinishing the concrete (the award including $4,311 for refinishing the concrete), and (5) $34,125.00 for redoing LEM's subgrade earthwork (the award included $68,250.00 for redoing LEM's subgrade/earthwork).  (Exhibit 2 attached to the AOE at pages 9 and 10.)

## III.   SUSSEX IS ENTITLED TO ENTRY OF A DEFAULT JUDGMENT

### A.   Introduction

In *Berkeley Assur. Co. v. Serrano,* 2014 U.S. Dist. LEXIS 170281 (W.D. TX 2014), the Court

discussed whether an insurer was entitled to a Default Judgment in its Declaratory Relief action.  In

part, the Court stated:

> Courts engage in a two-part analysis in order to determine whether a default judgment should be entered against a defendant. (Citation omitted.) In the first step, the Courts assess whether entering default judgment is appropriate considering six factors. (Citation omitted.)  If the Court finds that entering default judgment is appropriate under the specific circumstances of the case, the Court then assesses the merits of the claim to determine if there is sufficient basis in the pleadings for the judgment. (Citation omitted.)

> Courts initially assess whether entering default judgment is appropriate by considering six factors: (1) "whether material issues of fact are at issue, (2) whether there has been substantial prejudice, (3) whether the grounds for default are clearly established, [(4)]whether the default was caused by a good faith mistake or excusable neglect, [(5)] the harshness of a default judgment, and [(6)]whether the court would think itself obliged to set aside the default on the defendant's motion." (Citations omitted.)

PLAINTIFF SUSSEX'S MOTION FOR A DEFAULT JUDGMENT          G:\4937\Pleadings\motionfordefaultjudgment_2.doc

Applying these facts to the instant case, the Court finds that default judgment is appropriate in this matter. Defendant has not filed any responsive pleadings, and thus there are no material facts in dispute. (Citation omitted.) Defendant has failed to be responsive in the seven months' time since it was served, resulting in prejudice to Plaintiff's interests by bringing the adversary process to a halt. Additionally, the ground for default judgment against Defendant are clearly established, as Plaintiff seeks a declaration that it has no duty to defend or indemnify Defendant in the Underlying Action. (Citations omitted.) There is no evidence to indicate that the default was caused by "good faith or excusable neglect" and Defendant's failure to file a responsive pleading or otherwise defend the instant lawsuit for more than seven months mitigates the harshness of the default judgment. (Citation omitted.) Finally, the Court is not aware of any facts that would give rise to "good cause" to set aside the default judgment if challenged by the Defendant. (*Id.* at *5-*6.)

Since NCS has not filed any responsive pleadings, there are no material facts in dispute. NCS's responsive pleading was due May 2, 2017. NCS's failure to timely respond to the Complaint has caused prejudice to Sussex's interests by bringing the lawsuit to a halt. Moreover, the basis for a Default Judgment is clearly established as Sussex seeks a declaration, under the first Sussex policy, that it had no duty to defend, indemnify, and pay the arbitration award against NCS. In addition, under the second policy, Sussex seeks a declaration that it had no duty to defend NCS against the arbitration, though it did. Moreover, under the second policy, Sussex seeks a declaration that it had no duty to indemnify and pay the award, except that portion of the award for $25,744.75 in administrative fees. There is no evidence indicating that the default was caused by good faith or excusable neglect of NCS. The agent for service of process of NCS was personally served with the Summons and Complaint on April 12, 2017, as evidenced by the Affidavit of Service on file. (AOE, Ex. 4.) NCS's failure to participate in this action mitigates the harshness of a default judgment.

Once the Court establishes the procedural requirements for a default judgment are satisfied, the Court must also evaluate whether declaratory relief is appropriate. In *RSDC Holdings, LLC v. Steinberg,* 2017 U.S. Dist. LEXIS 4465 (E.D. LA. 2017), the Court stated:

"When considering a declaratory judgment action, a district court must engage in a three-step inquiry." (Citation omitted.) First, the Court must determine whether the declaratory action is justiciable. Or, in other words, whether an "actual controversy" exists between the parties to the action. (Citation omitted.) Second, if the Court has jurisdiction, it must determine whether it has the "authority" to grant declaratory relief. (Citation omitted.) Finally, the Court must determine whether to exercise its discretion to decide or dismiss the declaratory action. (*Id.*

11

at *5 - *6.)

There is a justiciable controversy. In the Complaint, Sussex alleged that there was a dispute concerning whether Sussex had a duty to defend and indemnify NCS. As to the whether the Court has authority to grant declaratory relief, there is no pending state court proceeding between Sussex and NCS. Thus, there is no need for mandatory abstention and the Court has the authority to enter a declaratory judgment (See *RSDC Holdings* at *7.) As to whether the Court would exercise its discretion to decide or dismiss the action, the factors that are relevant include whether there is a pending state court action, whether plaintiffs were forum shopping and judicial economy. (See *RSDC Holdings* at *7-*9.) There is no pending state court action. Sussex did not engage in forum shopping in filing the instant action. LEM is a Texas Corporation. (Comp., ¶4 (AOE, Ex.1).) NCS is a Texas limited partnership. (Comp., ¶5 (AOE, Ex. 1).) Sussex is a South Carolina Corporation (Comp., ¶3 (AOE, Ex.1).) The arbitration concerned a Sludge Dewatering Building in Sugar Land. (Comp., ¶8 (AOE, Ex. 1.) Retaining the instant action would also serve the purposes of judicial economy because Sussex and the Court have expended time and resources on this case. The final issue is whether the Court would enter a Default Judgment. As discussed above, the Court must assess the merits of the claim to assess if there is a sufficient basis in the pleadings for the judgment.

**B.     Sussex is Entitled to Entry of a Default Judgment**

**1.     Sussex Has no Duty to Indemnify NCS or Pay the Award Under the First Policy**

Sussex's Second Claim for Relief asserted that Sussex has no duty to indemnify NCS against the award under the first policy. (Comp., ¶'s 27-29 (AOE, Ex.1).) Sussex's Third Claim for Relief asserted that Sussex has no duty to pay any portion of the award under the first policy. (Comp., ¶'s 30-32 (AOE, Ex. 1).) The first policy was in effect from April 4, 2011 to April 4, 2012. (Comp., ¶6 (AOE, Ex. 1).) The NCS work at-issue, in the arbitration proceeding, was not even commenced until after the first policy expired on April 4, 2012. (Comp., ¶'s 28(a) and 31(a) (AOE, Ex. 1).) The arbitration award against NCS arises out of its work pouring the structural concrete for the Sludge Dewatering Building foundation on May 19, 2012. (Comp., ¶'s 10, 28(a) and 31(a) (AOE, Ex. 1).) Since the work of NCS at-issue did not take place until after the first policy expired on April 4, 2012,

12

Sussex (1) has no duty to indemnify NCS against the award under the first policy (Sussex's Second Claim for Relief), and (2) has no duty to pay any portion of the award under the first policy (Sussex's Third Claim for Relief).

The award includes $255,611.39 for LEM's attorneys' fees and costs. The award does not describe these fees and costs as damages. Paragraph 10 of the LEM/NCS subcontract provided for an award of attorneys' fees/costs to the prevailing party in the event of litigation concerning the subcontract. Attorneys' fees awarded under a prevailing party provision are not considered damages. (See *Intercontinental Group Partnership v. KB Home Lone Star L.P.,* 295 S.W.3d 650, 651 (Tex App. 2009).) Coverage for these fees/costs is governed by the first policy's Supplementary Payments Provision, which, in part, provides:

Supplementary Payments - Coverages A and B.

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

                    *        *        *

e. All court costs taxed against the insured in the "suit".

                    *        *        *

These payments will not reduce the limits of insurance. (Ex. A, at pages 7-8, on form CG 00 01 12 04 ("form 04"), attached to the Comp. (AOE, Ex.1).)

Thus, the first policy does not cover the award of attorneys' fee and costs, because Sussex did not provide NCS with a defense under the first policy, and, as explained immediately below, Sussex had no duty to defend NCS under the first policy.

### 2.    Sussex Had no Duty to Defend NCS Under the Policies

Sussex's First Claim for Relief alleged that it had no duty to defend NCS under the first policy. (Comp., paragraphs 24-26, (AOE, Ex.1).) Sussex's Fourth Claim for Relief asserted that it had no duty to defend NCS under the second policy. (Comp., paragraphs 30-32, (AOE, Ex.1).)

PLAINTIFF SUSSEX'S MOTION FOR A DEFAULT JUDGMENT        G:\4937\Pleadings\motionfordefaultjudgment_2.doc

1    Texas Courts apply the "eight-corners" rule in determining the duty to defend. (*Potomac*

2   *Ins. Co. v. Jayhawk Med. Acceptance Corp.*, 198 F.3d 548, 551 (5th Cir. 2000).)  A Court decides

3   if an insurer owes a duty to defend "solely from the allegations in the most recent [underlying]

4   petition and the language of the insurance policy." (*Harken Explo. Co. v. Sphere Drake Ins.*

5   *P.L.C.*, 261 F.3d 466, 471 (5th Cir. 2001).)  The insured bears the burden of showing that the

6   claim against it is potentially within the insurance policy's scope of coverage. (*Ibid*.)  If the

7   insurer relies on the policy's exclusions to deny coverage, the burden shifts to the insurer. (*Ibid*.)

8    Moreover, in *ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832,

9   840 (5th Cir. 2012), the Court stated:

10    Only a few Texas appellate Courts have held that the examination of extrinsic
11    evidence was warranted under an exception to the eight-corners rule.  (*Ooida Risk
      Retention Group, Inc.,* 579 F.3d at 475 (Citations omitted).  The exception to this
12    rule is limited to cases where "it is initially impossible to discern whether coverage
      is potentially implicated and when the extrinsic evidence goes solely to
13    fundamental issue of coverage which does not overlap with the merits of or engage
      the truth or falsity of any facts alleged in the underlying case".  (Citation omitted.)
14

15   **a.    Insuring Agreement**

16   The policies' Insuring Agreement, in part, provides:

17   a.    We will pay those sums that the insured becomes legally obligated to pay as
18         damages because of "bodily injury" or "property damage" to which this
           insurance applies. We will have the right and duty to defend the insured
19         against any "suit" seeking those damages. However, we will have no duty to
           defend the insured against any "suit" seeking damages for "bodily injury" or
20         "property damage" to which this insurance does not apply. We may, at our
           discretion, investigate any "occurrence" and settle any claim or "suit" that
21         may result.

22                                            ***
23

24   b.    This insurance applies to "bodily injury" and "property damage" only if:

25   (1)   The "bodily injury" or "property damage" is caused by an "occurrence" that
           takes place in the "coverage territory";
26

27   (2)   The "bodily injury" or "property damage" occurs during the policy period;
           and . . . . (Ex. A, at page ("p.") 1, on form 04, and Ex. B, at p.1, on form CG
28         00 01 12 07 ("form 07"), attached to the Comp. (AOE, Ex.1).)

\*\*\*

The policies define "property damage" as:

a.  Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.  Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

The incorporation of a defective component in a building is not 'property damage' unless it causes damage to the surrounding property. (*General Manufacturing Co. v. CNA Lloyd's of Texas*, 806 S.W.2d 297, 299 (Tex. Ct. App. 1991) .)

As to the claims alleged in LEM's Demand for Arbitration, there were no allegations of "property damage".   There were allegations of wood stakes "left-behind" in the concrete and of an alleged cold joint.  There were also allegations of "potential voids in the concrete" and of "potential delamination concerns".  (See Aff. Feemster, ¶4 and Ex. 6 attached to the AOE (the Demand for Arbitration) at p. 6, ¶'s 13-14.) The claim that there were wooden stakes left in the concrete is not a claim for "property damage", because it is not a claim for physical injury to tangible property.   The claims concerning "potential voids in the concrete "and "potential delamination concerns" are not claims for property damage.  These are merely assertions that something might happen, but there is no allegation, in the Demand for Arbitration, that there was delamination or voids in the concrete.  As to the claim of an alleged cold joint, *Cold Joints,* The Concrete Society, (July 20, 2017) http://www.concrete.org.uk./fingertips-nuggets.asp?cmd=display&id=372, in part, states:

Cold joints are formed primarily between two batches of concrete where the delivery and placement of the second batch has been delayed and the initial placed and compacted concrete has started to set.  The full knitting together of two batches of concrete under vibration to form a homogenous mass is not possible, unlike the compaction of two fresh workable batches of concrete.  This could be a potential plane of weakness.

PLAINTIFF SUSSEX'S MOTION FOR A DEFAULT JUDGMENT          G:\4937\Pleadings\motionfordefaultjudgment_2.doc

Cold joints, unlike cracks that form in hardened concrete through tensile restraint, are not gaps in the concrete but merely seams containing no appreciable void structure. They are usually linear, closely joined and bonded. However, there is a danger of small voids in areas where the concrete is not fully compacted, as with any concrete pour.

Generally, cold joints are not a problem structurally if the joint is in compression. However, the location of the joint within the structure, the structural function of the element and aesthetics need to be considered when assessing a cold joint. (AOE, Ex. 7.)

The allegations, in LEM's Demand for Arbitration, concerning a cold joint do not allege "property damage". The allegations merely concern defective work. There are no allegations in LEM's Demand for Arbitration that there is any cracking or erosion of the concrete in the foundation.

Assuming *arguendo,* the Court finds that there were allegations of "property damage", then, as mentioned above, the "property damage" must take place during the policy period of a particular policy. Hence, if the "property damage" at-issue did not "arise" during the policy period, then there is no coverage under the policy. The "property damage" could not have taken place during the first policy period, because, as explained above, the work did not take place until that policy expired.

Assuming *arguendo*, the Court determines that there were allegations of "property damage" during one or more policy periods, then the Exclusions discussed below would preclude all coverage.

### b. Exclusion j(5)

Exclusion (j)(5) states the following:

That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations. (Ex. A, at p. 5, on form 04, and Ex. B, at p. 5, on form 07, attached to the Comp. (AOE, Ex.1).)

The "use of the present tense 'are performing operations' in exclusion j(5) makes clear that the exclusion only applies to property damage that occurred during the performance of construction operations." (*Mid-Continent Cas. Co. v. JHP Dev., Inc.*, 557 F.3d 207, 213 (5th Cir. 2009). To the

extent that any property damage took place prior to the time NCS finished its work on the foundation, Exclusion j(5) would preclude coverage.

### c.    **Exclusion j(6)**

Exclusion j(6) provides the following:

> That particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it ...

Paragraph (6) of this exclusion does not apply to "property damage" including in the "products-completed operations hazard." (Ex. A, at p. 5, on form 04, and Ex. B, at p. 5, on form 07, attached to the Comp. (AOE, Ex.1).)

The policies define "your work" as including "work or operations performed by you or on your behalf". (Ex. A, at p. 15, on form 04, and Ex. B, at p. 16, on form 07, attached to the Comp. (AOE, Ex.1).) "Products-completed operations hazard" coverage does not apply to work that has not been completed.  In part, this provision provides that "work will be deemed completed when all the work called for in your contract has been completed".  Moreover, this provision provides that "work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed".  (Ex. A, at p. 14, on form 04, and Ex. B, at p. 15, on form 07, attached to the Comp. (AOE, Ex.1).)

Exclusion j(6) precludes coverage for the costs of repairing or replacing particular defects that were created before the insured's operation are completed.  To the extent that the Court finds any alleged property damage to the slab took place prior to the time NCS finished its work, Exclusion j(6) would preclude coverage for any damage to the particular part of the slab that must be restored, repaired, or replaced because NCS performed faulty work on it.

### d.    **Exclusion "L"**

Exclusion "L" precludes coverage for:

> "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

17

PLAINTIFF SUSSEX'S MOTION FOR A DEFAULT JUDGMENT         G:\4937\Pleadings\motionfordefaultjudgment_2.doc

> This exclusion does not apply if the damaged work or the work out of
> which the damage arises was performed on your behalf by a
> subcontractor. (Ex. A, at p. 5, on form 04, and Ex. B, at p. 6, on form
> 07, attached to the Comp. (AOE, Ex.1).)

In *Wilshire Insurance Co. v. RJT Construction, LLC*, 581 F. 3d 222, 226 (5th Cir. 2009), the Court held that Exclusion L precludes coverage for the cost of repairing the insured's own work. In the underlying litigation, the Plaintiff alleged that the insured negligently repaired the house's foundation, causing cracks in the walls and ceilings. The Court held that the "your work" exclusion applied to preclude coverage for the cost of repairing and replacing the insured's foundation but did not exclude coverage for damage to other property as a result of the defective work. (*Id.* at 226.)

If the Court finds that any alleged "property damage" arose out of NCS' completed work, this Exclusion would exclude coverage such damages, unless the damaged work or the work out of which the damage arose was performed on NCS's behalf by a subcontractor.

### e. **Exclusion "M"**

Exclusion "M" precludes coverage for:

> "Property damage" to "impaired property" or property that has not been
> physically injured, arising out of:
>
> (1)    A defect, deficiency, inadequacy or dangerous condition in "your
> product" or "your work"; or
>
> (2)    A delay or failure by you or anyone acting on your behalf to perform a
> contract or agreement in accordance with its terms.
>
> This exclusion does not apply to the loss of use of other property
> arising out of sudden and accidental physical injury to "your product"
> or "your work" after it has been put to its intended use. (Ex. A, at p.
> 5, on form 04, and Ex. B, at p.5, on form 07, attached to the Comp.
> (AOE, Ex. 1).)

The policies provide:

18

"Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a.      It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b.      You have failed to fulfill the terms of the contract or agreement;

if such property can be restored to use by:

*a.*      The repair, replacement, adjustment or removal of "your product" or "your work"; or

*b.*      You fulfilling the terms of the contract or agreement. (Ex. A, at p.12, on form 04, and Ex. B, at p.13, on form 07, attached to the Comp. (AOE, Ex.1.)  (The later policy does not include the italicized text.)

The exclusion is generally limited to any "loss of use" or "failure to complete" claim for property that has not been physically injured.  In *Admiral Ins. Co. v. H&W Indus. Servs.*, 2011 U.S. Dist. LEXIS 9417, *14 (W.D. Tex. 2001), the Court stated that "[s]ubstituting in the relevant definitions from the Policy, the 'impaired property' exclusion may be restated as an exclusion for claims based on a loss of use of uninjured property, where the loss of use arises from a defect."

If there are any allegations of "property damage" in the Demand for Arbitration, which Sussex denies, then the Exclusions discussed above would preclude all coverage, irrespective of whether any such damage is an ongoing operation damage or a completed operation damage.  The Demand for Arbitration merely concerns problems with NCS's work on the slab.  It does not allege that NCS caused problems to any part of the project.

### 3.      Sussex Need Not Indemnify Nor Pay the Award Under the Second Policy, Other Than to the Extent It has Already Paid for the Award

Sussex's Fifth Claim for Relief asserted that Sussex has no duty to indemnify NCS against the award under the second policy. (Comp., ¶ 36-38 (AOE, Ex.1).)  Sussex's Sixth Claim for Relief asserted that Sussex has no duty to pay any portion of the award under the second policy. (Comp., ¶'s 39-41 (AOE, Ex.1.)  (The award is attached to the AOE as Ex. 9.  and discussed in the Aff. Feemster at ¶5.)

### a.    Attorneys' Fees/Costs Under the Award

The award includes $255,611.39 for LEM's attorneys' fees/costs. The award does not describe these fees and costs as damages. Coverage for this portion of the award is controlled by the second policy's Supplementary Payments Provision which, in part, provides:

Supplementary Payments - Coverages A and B.

1.    We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

*** 

e. All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

*** (Ex. B, at p.8, on form 07, attached to the Comp. (A0E, Ex. 1).)

The second policy does not cover the award of attorneys' fee and costs, because it specifically provides that court costs taxed against the insured for attorney fees and expenses are not covered.

### b.    Damages included in the Award

The award included damages totaling $610,349. The damages include $58,024 for costs back-charged to LEM, which includes $49,685 for work of other subcontractors that had to be removed and was damaged, to repair NCS' defective work. The remaining damages total $552,325 for the repair and replacement of NCS' defective work and are broken down in Claimant's Exhibit C-46, which is attached to the AOE as Ex. 10, and referred to in the Aff. Feemster at ¶ 6. Document Bates Stamped LEM004172 in Exhibit C-46 reveals that the $552,325 is comprised of (1) $15,936 for "structural investigation" (which was a subcontractor expense); (2) $296,187 for "slab demo" (which was $44,259 for labor, $19,917 for burden, $21,277 for material, $94,411 for equipment, $78,049 for subcontractors, $5,231 for "other", and $33,044 for service and repair equipment); (3) $68,250 for "earth work/slab prep" (which was $46,147 for labor, $20,766 for burden, and $2,338 for material); and (4) $171,951 for "form and pour new slab" (which was $64,751 for labor, $29,138 for burden, $65,326 for material, and $12,736 for subcontractors).

1       There was evidence of defective work introduced at the arbitration.  However, as explained

2  below, such defective work, if deemed "property damage", would be excluded by Exclusions "j(5)",

3  "j(6)" and/or "l", because the  "property damage" took place during NCS' "ongoing operations".

4  (This argument also applies to the duty to indemnify and pay the award under the first policy.) Ex. C-

5  10, from the arbitration, is an e-mail, dated May 21, 2019 at 7:54 a.m., from Michael Fox, a Senior

6  Project Manager for CH2M Hill, to Steve Castle of LEM which advises that "the City came by to see

7  me earlier to show me a picture of an area of the slab where extensive spider cracking has already

8  developed." (emphasis added, Aff. Feemster, ¶ 7, Ex. 11, attached to the AOE.) Thus, at most, two

9  days after the concrete was poured, cracking was noticed.  Arbitration Ex. R-6 includes a LEM Daily

10  Report, dated May 21, 2012. (Aff. Feemster, ¶ 8, Ex. 12, attached to the AOE.) The Daily Report

11  indicates, at LEM000356, that NCS was working at the site on May 21, 2012 – two days after the

12  concrete was poured.  The Daily Report advises that "NCS - wet cure the slab, start breaking loose

13  the form bracing".

14       Arbitration Ex. R-8 includes a LEM Daily Report, dated May 23, 2012. (Aff. Feemster, ¶ 9;

15  Ex. 13 attached to the AOE is the Daily Report.) The Daily Report, at LEM000362, indicates that

16  NCS was working at the site.  The Report advises that the "slab is wet curing for one week".  In part,

17  the report states "NCS was on site briefly with a rep. from Paradigm Consultants to look at slab and

18  discuss testing methods to locate wood stakes in the slab and see what procedure they can come up

19  with to get them and remove.  NCS to meet with Larry . . . tomorrow".

20       The LEM Daily Report, dated May 25, 2012, indicates, at LEM000370, that NCS was

21  working on the site. (Aff. Feemster, ¶ 10; Ex. 14 attached to the AOE is the Daily Report.)  In part,

22  the Report stated "NCS – stripping edge forms, get water and cotton mats off of slab. Start drilling

23  operation to see if they can locate stakes in the slab and determine corrective measures for the slab."

24       The above-detailed evidence demonstrates that cracking of the slab commenced while NCS

25  was still working on the slab.  NCS was working on the slab at least six days after the slab was

26  poured, and four days after spider cracking was noticed.  As of the end of May of 2012, all of the

27  work called for in NCS' subcontract had not been completed.  The subcontract provides that "the

28  final pay application is utilized when all Work has been completed, including punch list items, and

21

PLAINTIFF SUSSEX'S MOTION FOR A DEFAULT JUDGMENT     G:\4937\Pleadings\motionfordefaultjudgment_2.doc

had been accepted by LEM and the Owner or the Owner's representative". The subcontract also provides that NCS would not be entitled to final payment until "all punch list times have been complete or accepted". Clearly, at the time that the cracking of the concrete was discovered, not all of the punch list items had been completed and accepted. There were still wood stakes in the foundation. Thus, there is no "Products-Completed Operations Hazard" coverage for the damage to the concrete. If damage to the slab is not excluded by Exclusion j(5) or Exclusion j(6), then it would be excluded by Exclusion L, because NCS had no subcontractors.

As explained in the concurrently filed Affidavit of James Silverstein at ¶3, Lee Shidlofsky, coverage counsel for LEM, had lengthy discussions with Sussex's counsel regarding insurance coverage for the award. Mr. Shidlofsky cited to *U.S. Metal, Inc. v. Liberty Mutual Group, Inc.,* 490 S.W. 3d 20, 28 (2015), which held physical injury caused by the repair of merely defective work constitutes "property damage" under the terms of a CGL policy. This case dealt with a factual situation where defective flanges were installed in diesel units at refineries. U.S. Metals, Inc., sold Exxon Mobil Corp., some 350 custom-made flanges. The flanges were then welded to piping in the diesel units. The pipes and flanges, after they were welded together, were covered with a special high temperature coating and insulation. After the flanges were installed, several flanges leaked. ExxonMobil decided to replace them to avoid the risk of a fire and of an explosion. The removal process included stripping the temperature coating and the insulation, removing gaskets and cutting the flanges out of the pipe. The Court stated that "the insulation and gaskets destroyed in the process were not restored to use; they were replaced". (*U.S.Metal, Inc.* at 28.) The Court then stated that cost of replacing the damaged items was covered by the CGL policy.

The *U.S. Metal* Court did not discuss the requirement that "property damage" must be caused by an "occurrence". We note that the United States Court of Appeals for the Ninth Circuit, in *New Hampshire Ins. Co. v. Viera,* 930 F.2d 696, 701 (9th Cir. 1991), held that the nature of repairs cannot convert noncovered damages into covered damage. The Court stated "[w]e hold that the nature of the repairs cannot create coverage where none exists." (*Id.*) Moreover, we note that the *U.S Metal* decision concerned "Products Completed Operations Hazard" coverage. In this case, as discussed above, the damages at-issue are "ongoing operations" damages. Moreover, the *U.S. Metal* decision

1  did not consider the application of Exclusions j(5) and j(6).

2       Unless the original damage is covered, the items damaged during repair should not be

3  covered. Otherwise, you eviscerate the work product exclusions. Under the reasoning of the *U.S.*

4  *Metal* decision, a CGL policy is effectively partially transformed into a performance bond. Coverage

5  is being provided for an insured's defective work, if the repair of the defective work causes damage

6  to non-defective work.

7       In light of *U.S. Metal*, Mr. Shidlofsky argued that the following items of damages were

8  covered: (1) $49,685 for work of other subcontractors that had to be removed and damaged to repair

9  NCS' defective work, (2) $42,932 for the cost of new rebar (which is included as a material cost for

10  the "form and pour new slab" damage portion of the award and is evidenced by document Bates

11  Stamp Nos. LEM004368 – 70 (Ex. 10 attached to the AOE)), (3) $12,736.49 for the cost to tie-in the

12  new rebar (which is identified as the subcontractor cost for the "form & pour new slab" damage

13  portion of the award), (4) $4,311 for the cost of refinishing the concrete, and (5) $68,250 spent on

14  redoing LEM's subgrade/earthwork. (Numbers 2-5 were included within the $552,325 figure.)

15       As discussed above, Sussex disagrees that the *U.S. Metal* decision is applicable. Nevertheless,

16  in order to amicably resolve its dispute with LEM, Sussex agreed to pay items 1-3 in full, and pay

17  one-half of items 4 and 5. Sussex's position regarding the rebar is that any damage to the rebar

18  would have taken place when NCS was pouring the foundation and is excluded by Exclusions j(5),

19  j(6) and Exclusion l.

20       Sussex contends that the refinishing of the concrete slab was not covered, because Sussex

21  originally finished the concrete slab. Replacement of the concrete slab did not damage the work of a

22  different contractor; it damaged NCS' own work. Thus, the *U.S. Metal* decision is inapplicable and

23  the cost of refinishing would not constitute covered "property damage".

24       As to the $68,250 spent on redoing LEM's subgrade/earthwork, this portion of the award

25  should not be covered. Exclusions j(5), j(6) and/or l should exclude all coverage for this part of the

26  award. As discussed above, the foundation had no covered damages. This portion of the award was

27  for putting the site back into a suitable condition such that a new slab could be poured after the

28  original slab and rebar were removed. Soil was removed/replaced and reshaped so that a new rebar

1   and a foundation could be installed. The *U.S. Metal* decision should be inapplicable to this portion of

2   the damage award for earthwork.

3   **IV.    CONCLUSION**

4        Sussex requests that the Court enter a default judgment in favor of Sussex and against

5   NCS holding that Sussex had no (1) duty to defend NCS against the arbitration under the first

6   policy and second policy, and (2) duty to indemnify NCS against the award, except for the

7   $25,744.75 for administrative fees/expenses of the American Arbitration Association and the

8   compensation/expenses of the arbitrator, including accrued interest, that Sussex previously paid.

9   Further, as explained in the Aff. Silverstein, at ¶ 11-12, Sussex requests $450.10 in costs.

Respectfully submitted,

DATED:  July 27, 2017            **YARON & ASSOCIATES**

By: ___*\s\ George D. Yaron*___
George D. Yaron
attorney-in-charge
CA SBN 96246, Admitted *Pro Hac Vice*
James I. Silverstein
of counsel
CASBN 143543, Admitted *Pro Hac Vice*
1300 Clay Street, Suite 800
Oakland, California 94612
415-658-2929 – Telephone
415-658-2930 – Facsimile
gyaron@yaronlaw.com; jsilverstein@yaronlaw.com

DATED:  July 27, 2017            **SHEEHY, WARE & PAPPAS, P.C.**

By: ___*\s\ James L. Ware*___
James L. Ware
of counsel
SBN 20861800
Two Houston Center
909 Fannin Street, Suite 2500
Houston, Texas 77010
713-951-1000 – Telephone
713-951-1199 – Facsimile
jware@sheehyware.com

**Attorneys for Plaintiff**
**Sussex Insurance Company**

24

**CERTIFICATE OF SERVICE**

I am over 18 years of age and not a party to the within action. I am employed in the County of Alameda; my business address is Yaron & Associates, 1300 Clay Street, Suite 800, Oakland, California 94612.

On **July 27, 2017**, I served the within:

**PLAINTIFF SUSSEX INSURANCE COMPANY'S NOTICE OF MOTION AND MOTION FOR A DEFAULT JUDGMENT**

in a sealed envelope with postage thereon fully prepaid, addressed to:

| |
|---|
| Bobby K. Sweeney<br>464 Legg Hollow Road<br>Lynchburg, TN 37352 |

( X )    **VIA U.S. CERTIFIED MAIL/RETURN RECEIPT REQUESTED:** I am "readily familiar" with the firms practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

( )    **VIA HAND-DELIVERY:** I caused such envelope, to be hand delivered to the stated parties.

( )    **VIA FAX:** I caused such documents to be transmitted via fax to the stated parties at their respective facsimile numbers.

( )    **VIA EXPRESS CARRIER:** I caused such documents to be collected by an agent from to be delivered to the offices of the stated parties.

( )    **VIA E-MAIL:** Pursuant to agreement, I caused such document to be sent via email to the offices of the addressees so designated.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on July 27, 2017, at Oakland, California.

Kelly Forst